# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

JOHN E VENN, JR,

      **Plaintiff,**

v.                               **CASE NO. 3:17cv818-MCR/EMT**

MARION D GRIZZLE,

      **Defendant.**

_____/

## ORDER

Plaintiff John E. Venn, Jr. ("Trustee") filed this action to recover allegedly preferential and fraudulent transfers pursuant to 11 U.S.C. §§ 547 & 548, as an adversary proceeding, *John E. Venn, Jr. v. Marion D. Grizzle*, Adv. Proc. No. 16-03020-KKS (Bankr. N.D. Fla.), within the Chapter 7 bankruptcy proceeding titled *In re Charlie M. Hamrick*, Case No. 15-31137-KKS (Bankr. N.D. Fla.). The reference was withdrawn by stipulation of the parties, and now pending is the Trustee's Motion for Summary Judgment on Counts I and IV of the Second Amended Complaint. ECF No. 22. In Count I, the Trustee seeks to avoid an alleged preferential transfer to Defendant Marion D. Grizzle in the amount of $1,000,000, pursuant to 11 U.S.C. § 547(b), and in Count IV, the Trustee seeks to recover the funds, if the transfer is avoided, from any immediate or mediate transferee of

Grizzle. Having fully reviewed the record and the parties' arguments, the Court finds that the motion is due to be granted.

**Background**

A.   <u>Procedural Posture</u>

In November 2015, three creditors of Charlie M. Hamrick ("Debtor")— namely, James Evans Rice, Jr., Scott P. Lowry, and Austin Laverne Enfinger—filed an involuntary Chapter 7 petition against Hamrick to adjudicate him bankrupt. During the bankruptcy proceedings, the Trustee filed several adversary proceedings, including the present action against Grizzle, to avoid preferential transfers that resulted from the Debtor's conduct, which allegedly amounted to a Ponzi scheme.[1] The Trustee alleged in the adversary proceedings that the Debtor had persuaded investors (the three petitioning creditors, Grizzle, and others), to invest in phony real estate deals based on the Debtor's misrepresentation that he would invest their money by purchasing and reselling certain parcels of real property, which would provide the investors a substantial profit in return. The Trustee also alleged that in

---

[1] As explained by the Eleventh Circuit, "[t]he essence of a Ponzi Scheme is to use newly invested money to pay off old investors and convince them that they are earning profits rather than losing their shirts." *Perkins v. Haines*, 661 F.3d 623, 625 n.1 (11th Cir. 2011). The scheme is named after "the notorious swindler, Charles Ponzi, who, starting in 1919, received $9,582,000 within a period of eight months by inducing investors to give him $100 for the promised repayment of $150." *United States v. Orton*, 73 F.3d 331, 332 (11th Cir. 1996) (internal quotation marks omitted).

CASE NO.  3:17cv818-MCR/EMT

carrying out the schemes, the Debtor used his corporation, H&H Construction of NW Fla. Inc. ("H&H"), to open bank accounts into which the investors' money was deposited and transferred in H&H's name. However, the real estate transactions were fabricated and never closed. Instead, the Debtor used the escrowed investor money of new investors to pay "profits" to prior investors and for his own personal benefit.

In addition to filing actions to avoid preferential transfers to certain investors, the Trustee filed an adversary proceeding against H&H and the Debtor, as President, seeking a declaration that H&H was the alter ego of the Debtor, thus allowing the Trustee to consolidate H&H's assets with the Debtor's property to be used for the benefit of all creditors. *See Venn, Jr. v. H&H Constr.*, Adv. Proc. Case No. 16-03018-KKS (N.D. Fla. Bankr.). H&H and the Debtor defaulted, and on August 2, 2016, while the *Grizzle* adversary proceeding was pending, the Bankruptcy Judge entered a default final judgment against the Debtor and H&H, with fact findings supporting a conclusion that H&H was the Debtor's alter ego and was used for an

improper purpose. The Bankruptcy Court authorized the Trustee to consolidate the corporate assets with those of the Debtor as "property of the estate."[2]

In this adversary proceeding against Grizzle, the Trustee seeks to avoid a transfer in the amount of $1,000,000 from H&H to Grizzle, asserting that the transfer was preferential and the money therefore constitutes property of the bankruptcy estate, which should be made available for the benefit of all creditors. The Trustee moved for summary judgment in Bankruptcy Court, arguing that the Debtor was in control of the funds so return of the payment could be considered property of the Debtor and alternatively that H&H was the Debtor's alter ego. The Bankruptcy Court denied the summary judgment motion, finding that, although the Trustee had proven the Debtor had control over the money in H&H's account, this was insufficient to deem the funds property of the Debtor because the account was owned solely by H&H. On the alternative alter ego theory, the Bankruptcy Court determined it was unclear whether the Trustee was still pursuing the theory, and in any event, the evidence in the record fell short of establishing it.[3] *Venn, Jr. v.*

---

[2] The Trustee concedes that the default judgment is not binding on Grizzle in this case. However, the relevant documentary evidence, including bank records, wire transfers, and depositions, are now included in the record of the instant case.

[3] The Bankruptcy Court acknowledged that there was evidence in the adversary proceeding against H&H to show that the Debtor had operated it for an improper purpose but that evidence

*Grizzle*, Adv. Proc. No. 16-03020-KKS, ECF No. 142, at 16 n.49 (N.D. Fla. Bankr. Oct. 2, 2017). Grizzle had also argued he was not on notice of the alter ego theory during discovery because it was not alleged in the complaint, and thus, the Bankruptcy Court permitted the Trustee to amend the complaint to expressly assert the alter ego theory and extended discovery. The Trustee filed a four-count Second Amended Complaint plainly alleging alter ego in its fraudulent and preferential transfer claims.[4]

The parties stipulated to withdrawal of the reference on grounds that Grizzle had demanded a jury trial and did not consent to have the case tried in Bankruptcy Court, and the Bankruptcy Judge recommended that the motion be granted.[5] This Court approved the stipulation, entered a Final Scheduling Order, and granted the Trustee's request to extend the dispositive motions deadline. The Trustee then filed

---

was not included in the summary judgment record before the Bankruptcy Court in the Grizzle adversary proceeding. Adv. Proc. No. 16-03020-KKS, ECF No. 142, at 16 n.49.

[4] In Count I, the Trustee seeks to avoid a $1 million preferential transfer to Grizzle under § 547(b); in Count II the Trustee seeks to avoid the $1 million transfer and a $20,000 transfer as fraudulent transfers under § 548(a)(1)(A); in Count III, the Trustee seeks to avoid both transfers as constructive fraudulent transfers, under § 548(a)(1)(B); and in Count IV, the Trustee seeks recovery of any avoided transfer from any immediate or mediate transferee of Grizzle. The Trustee also seeks pre and post-judgment interest on any transfer avoided.

[5] *See* 28 U.S.C. § 157(e) ("[T]he bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.").

CASE NO. 3:17cv818-MCR/EMT

the pending dispositive motion asserting the undisputed record shows that H&H is the Debtor's alter ego. Grizzle argues in response that a trial is necessary because genuine issues of fact remain.

B.   <u>Undisputed Facts</u>

The undisputed facts include the following. Grizzle testified by deposition that he was introduced to the Debtor through a friend, and the Debtor offered him an opportunity to invest in the acquisition of an apartment complex in Tuscaloosa, Alabama. The Debtor showed him pictures of the complex. Grizzle said the Debtor explained the transaction would be run through H&H, his construction company, which would be the purchasing agent if he chose to invest. The Debtor told him that H&H had a relationship with several banks (Chase, Bank of America, and Wells Fargo), which gave it the first opportunity to proceed on short sales. Grizzle said the Debtor told him that he already had a buyer lined up, an investment group in California, so the transactions would occur on the same day. The Debtor explained that they would acquire the apartment complex through H&H for $1,350,000, and the California group would purchase it for $2,150,000. The Debtor presented Grizzle with contracts to sign, showing the seller as Chase Home Finance RIO Division and showing H&H as the seller for the resale, as agent for Debtor and Grizzle. Grizzle partially funded the acquisition with an investment of $1,000,000,

and understood that in return, he would receive $1,750,000 when the transaction closed. The Debtor assured Grizzle that his $1,000,000 would be placed in escrow and only disbursed at the closing. Grizzle never authorized its use for any other purpose.

Grizzle signed the contracts and paid the money by two separate $500,000 transfers on April 8 and 9, 2015. The closing was to be in May. On April 28, 2015, the Debtor transferred $20,000 to Grizzle from H&H's Wells Fargo Account,[6] saying it was a payment to extend the closing date. But the transaction had been fabricated, so no real estate closing ever occurred. On October 13, 2015, the Debtor paid Grizzle $1,000,000 from a SunTrust account in H&H's name, which was four days after another investor (one of the petitioning creditors[7]) had transferred $1,500,000 to H&H's SunTrust account on similar representations of a real estate investment deal with the promise of a large return on the investment.[8] Grizzle then

---

[6] The record reflects that on October 2, 2009, the Debtor opened a bank account in the name of H&H at Wachovia Bank, N.A., now known as Wells Fargo Bank, N.A., as the account's sole authorized signatory (the "Wells Fargo Account"). Wells Fargo closed the Wells Fargo Account in September 2015 because it was overdrawn by the amount of $17,275.23.

[7] The record includes the evidence pertaining to this investor, Jim Rice, which is also undisputed and shows that Rice had transferred $1,650,000 to the H&H account in October 2015.

[8] On August 28, 2015, shortly before Wells Fargo closed the Wells Fargo Account, the Debtor established an account in the name of H&H at SunTrust Bank (the "SunTrust Account") with Debtor listed as the account's sole authorized signatory and an initial deposit of $100.

deposited the $1,000,000 into his own account. Also, on October 27, 2015, the Debtor issued Grizzle a check for $750,000 from the SunTrust account, but this check did not clear when Grizzle attempted to deposit it. Grizzle testified that he transferred the funds to H&H based on the Debtor's representation of the deal and based on the contracts he signed. ECF No. 22-34, at 72. The contracts show he was aware of H&H's involvement and thought that the transaction would be completed through H&H.

Bank records show that on April 7, 2015—the day before Grizzle transferred his first $500,000 to H&H—the Wells Fargo Account had a balance of only $3,649.85. Immediately after receiving Grizzle's money, the Debtor—with sole signatory authority over the Wells Fargo Account—transferred hundreds of thousands of dollars to various third parties who were not affiliated with the purported bank, Chase Home Finance, or the transaction involving Grizzle. The Trustee presented evidence showing that some of the investors were repaid with funds directly traceable to Grizzle's $1,000,000 payment. *See* ECF No. 22-10 (investor summary). On April 10, 2015—the day after Grizzle transferred his second $500,000 installment to the H&H Wells Fargo Account—the Wells Fargo Account balance was $79,104.66, due to the Debtror's unauthorized transfers of money to various third parties. In addition, the record shows transactions that raise a

CASE NO. 3:17cv818-MCR/EMT

reasonable inference that funds from the H&H account were transferred to the Debtor's personal use, with transactions for ATM cash withdrawals, transfers to personal accounts, and transactions with Publix, Best Buy, Google Play, Troy University, restaurants, etc.

The Trustee presented undisputed evidence that the Debtor persuaded other investors to participate in the phony real estate scheme as well, using similar misrepresentations, i.e., that money invested and transferred to accounts in the name of H&H would be used to acquire real estate and would generate a profitable return. The record reflects that during the years 2013-2015, leading up to the involuntary bankruptcy, the Debtor fraudulently induced over a dozen different individuals to collectively transfer millions of dollars to accounts that the Debtor maintained in the name of H&H, which he used to pay some investors and also for his personal benefit. Bank records and other documents are voluminous but are summarized by the Trustee. The Court will not recite the facts of the entire scheme but will incorporate by reference the investor summary, ECF No. 22-10, which establishes the undisputed details of the scheme.[9]

---

[9] Grizzle has not presented evidence to challenge the Trustee's evidence regarding the scheme itself as it pertained to him or any other victim investor.

CASE NO.  3:17cv818-MCR/EMT

At issue is whether H&H, a Florida corporation, is the alter ego of the Debtor. H&H's Articles of Incorporation identify the Debtor as the sole incorporator, officer, and registered agent and lists the Debtor's residence as H&H's principal place of business and corporate mailing address. H&H filed annual reports each year, the Debtor opened bank accounts in its name, and the Debtor and H&H were issued a general contractor's license. In July 2014, the Debtor applied to register H&H Construction, Inc. as a fictitious entity with the Florida Secretary of State, designating the Debtor and H&H as the owners. However, the company kept no formal corporate business records and did not pay the Debtor a regular salary. The Debtor represented in his sworn bankruptcy schedules that he operated H&H as an individual and sole proprietor, not as a separate legal entity. *See* Bankr. Proc. No. 15-31137, 224, at 4 (Bankr. N.D. Fla.) (Chapter 7 Petition). The Trustee issued a comprehensive document production subpoena to H&H, seeking a host of documents related to its "General Contractor" business and observance of corporate formalities, including building permits, financial records pertaining to construction jobs performed, tax returns, original share certificates, and minutes from any meeting of H&H directors/shareholders. H&H responded to the H&H Production

CASE NO. 3:17cv818-MCR/EMT

Subpoena stating that it was not in possession of any responsive documents.[10]  At the first meeting of creditors, the Debtor asserted his Fifth Amendment right regarding questions about the revenue that H&H generated from lawful business activity in the years 2013-2015.  Also, at the Debtor's deposition, in his individual capacity and as the designated corporate representative of H&H, he asserted his Fifth Amendment right not to incriminate himself in response to every question asked.

From April 2014 through April 2016, H&H had one salaried employee, the Debtor's son-in-law, William Bagwell.  Bagwell worked for H&H as a construction foreman and earned $59,800 annually and received W-2s.  Bagwell testified by deposition that he applied for the position after his discharge from military service (but had no copy of the application or an employment contract), the Debtor was his boss, there were no other employees, and he reported to work each morning at the Debtor's house for assignments, and from there, he would do whatever the Debtor needed him to do at job sites all around Pensacola, Florida, and Cantonment, Florida. Bagwell testified that he left this job in April 2016 because he did not like the work of residential remodeling, "framing, drywall, electrical, everything."  ECF No. 23-4, at 17. Bagwell later explained that the work was actually performed by

---

[10] In response to the summary judgment motion, Grizzle presented H&H's S corporate tax returns for 2013 and 2014.

subcontractors, stating "everything was subbed out." ECF No. 23-4, at 39. Bagwell could not recall the names of any subcontractors or individuals who worked for H&H or any construction sites in particular. Bagwell remembered only one H&H project with any detail—building a porch for someone named Boyd in 2016. The record includes three building permits issued for H&H projects in 2011, one permit in 2012, two permits in 2014, and one in 2015.

**Discussion**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing on the record that there is no genuine dispute of fact and that the plaintiff has failed to establish an element essential of the claim. *See Allen v. Bd. of Pub. Educ*., 495 F.3d 1306, 1313 (11th Cir. 2007); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If this burden is satisfied, then the nonmoving party must go beyond the pleadings and "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. The Court views all evidence in the light most favorable to the party opposing the motion and draws all reasonable inferences in favor of the non-movant "to the extent supportable by the record." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).

CASE NO.  3:17cv818-MCR/EMT

Moreover, "credibility determinations, the weighing of evidence, and the drawing of inferences from the facts" are matters left to the jury. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). The non-moving party must demonstrate more than the existence of "some metaphysical doubt" regarding the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "the mere existence of a scintilla of evidence" or conclusory allegations are insufficient to create a genuine issue of fact, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is proper if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec.*, 475 U.S. at 587.

A bankruptcy trustee "may avoid any transfer of an interest of the debtor in property" (1) to or for the benefit of a creditor; (2) on account of an antecedent debt owed by the debtor; (3) made while the debtor was solvent; and (4) made within 90 days before the date of the filing of the petition; and (5) the transfer enabled the creditor to receive more than it would have pursuant to a chapter 7 bankruptcy. 11 U.S.C. § 547(b). In the prior summary judgment proceedings before the Bankruptcy Judge, it was determined that the elements listed in subsections (1) through (5) had been proven, and thus they are not at issue here. *See* ECF No. 22-54 at 5-6; Adv. Proc. No. 16-03020-KKS, ECF No. 142, at 4-5 ("Grizzle does not contest that he

received the $1 million check from H&H within 90 days pre-petition" and it is undisputed that Grizzle "was a 'creditor' of the Debtor with a claim as of the date of the petition"); Adv. Proc. No. 16-03020-KKS, ECF No. 156, at 2 ("Trustee has sustained his burden to prove that the subject transfer enabled the Defendant Grizzle to receive more than he would in a hypothetical Chapter 7 liquidation had the transfer never been made as contemplated by section 547(b)(5)"). This is the law of the case but also remains true on the undisputed facts before this Court. Therefore, the only issue to be decided is whether H&H is the Debtor's alter ego, such that its bank accounts constitute "an interest of the debtor in property." § 547(b).

The Bankruptcy Code does not define property rights; instead, "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979); *see also Title Max v. Wilber*, 876 F.3d 1302, 1310 (11th Cir. 2017) (while federal law governs whether a debtor's property interest is property of the estate, state law determines the nature and existence of the debtor's property right or interest). Under Florida law, "[i]t is black-letter law that a corporation is a 'separate entity, a legal being having an existence separate and distinct from that of its owners.'" *Lort v. Ferguson Enters. (In re Lort)*, 347 B.R. 909, 910 (M.D. Fla. 2006) (quoting *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098,

1102 (5th Cir. 1973[11])); *see also Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008) ("a corporation is a separate legal entity"). A corporation's property is not property of the shareholder, even if it has only one shareholder. *Lort,* 347 B.R. at 910. Nonetheless, that separate identity "will be disregarded on proof that it is a 'mere instrumentality' of, that is to say, it is completely dominated by, another corporation or individual, and that it is a device or sham to mislead creditors or exists for some other fraudulent purpose*." In re Gherman*, 103 B.R. 326, 330-31 (Bankr. S.D. Fla. 1989) (applying Florida law); *see also Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1121 (Fla. 1984) ("[T]he corporate veil may not be pierced absent a showing of improper conduct.").

Although the concept of alter ego remains flexible and equitable in nature, *see In re Checiek*, 492 B.R. 918, 920-21 (Bankr. M.D. Fla. 2013), the party seeking to overcome a corporation's separate existence and pierce the corporate veil faces "a very heavy burden," *Hillsbury Holdings Corp. v. The Celotex Corp.* (*In re Hillsborough Holdings Corp.*), 166 B.R. 461, 468 (M.D. Fla. 1994). Courts may disregard the corporate form only in "extraordinary cases." *In re Checiek*, 492 B.R. at 920-21. When alter ego is proven, "a judgment debtor and an alter ego are treated

---

[11] *See Bonner v. City of Prichard*, 661 F.2d1206, 1209 (11th Cir. 1981) (*en banc*) (adopting case law of the former Fifth Circuit developed before October 1, 1981, as precedent in this Circuit).

as the same entity." *Longo v. Associated Limousine Servs., Inc.*, 236 So. 3d 1115, 1121 (Fla. 4th DCA 2018) (also stating in proceedings supplementary under Florida law, the statutory phrase, "any property of the judgment debtor," includes property of an alter ego).

To pierce the corporate veil and justify disregarding the separateness of the corporate form, Florida law requires proof of the following:

> (1)  the shareholder dominated and controlled the corporation to such an extent that its separate existence was in fact non-existent but only an alter ego of the shareholder;
>
> (2)  the corporate form was used fraudulently or for an improper purpose; and
>
> (3)  the fraudulent or improper use of the corporate form caused injury to the claimant.

*See Gasparini*, 972 So. 2d at 1055; *In re Pearlman*, 462 B.R. 849, 855 (Bankr. M.D. Fla. 2012) (citing *Dania Jai–Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114 (Fla.1984)). Grizzle argues that the first and second elements are inherently factual and not appropriate for determination on summary judgment. Without question, these elements are highly fact specific, but courts have determined that, "[w]hile the alter ego inquiry is 'heavily fact-specific,' it may be decided on summary judgment." *United States v. Peeler*, No. 613cv1152-ORL-40-GJK, 2016 WL 7668485, at *4

(M.D. Fla. July 13, 2016). The Court finds this to be the extraordinary case in which each element is established by the undisputed record.

First, the record demonstrates that the Debtor dominated H&H to the extent that it lost its independent corporate existence. The Debtor was not only the sole officer and shareholder of H&H and the sole signatory on the H&H bank accounts, he considered himself a sole proprietor, as shown on his sworn bankruptcy schedule. He observed only the most basic corporate formalities necessary to keep the corporation in existence, such as filing its articles of incorporation and annual reports, filing tax returns (at least for 2013 and 2014), and opening bank accounts in H&H's name. No other formalities were observed in H&H's management, operation, and record keeping. In response to a subpoena requesting records that would show the corporate existence, such as financial books, building permits issued to the corporation, meeting minutes, documents relating to H&H's financial condition or purchase or real estate and salaries paid to employees, the corporation's response was that no such documents existed. The record reflects only 2 building permits issued to H&H in 2014 and only one in 2015, the year of Grizzle's investment. And the Debtor "took the Fifth" when questioned about anything related to the formation, management, operation, or profitability of H&H.

CASE NO. 3:17cv818-MCR/EMT

Grizzle argues that a question of fact exists because the bank records, the building permits issued, and the testimony of Bagwell show that H&H conducted *some* legitimate construction business as a general contractor. The Trustee does not deny that H&H performed some amount of legitimate work but contends that any legitimate business and income was de minimis in comparison to the Ponzi scheme that the Debtor operated using H&H. The Court agrees and finds no material dispute of fact on this issue. The building permits in evidence are few (three building permits in 2011, one permit in 2012, two permits in 2014, and one in 2015). Bagwell's testimony, even if true, adds little because of his inability to recall any details.[12] His testimony confirms that H&H had one employee—Bagwell, who was the Debtor's son-in-law—and that H&H had *some* legitimate construction work. But Bagwell's testimony also confirms the Debtor's complete domination over the company in that Bagwell acknowledged the Debtor was solely in charge of the business and all decisions.[13] Moreover, the same bank records that reflect some

---

[12] The Court does not find it appropriate to deem Bagwell's testimony a sham and will not engage in credibility calls on summary judgment. Notwithstanding and without considering issues of credibility, the Court finds his testimony insufficient to create a material issue of fact as to alter ego.

[13] Bagwell testified that he showed up at the Debtor's house and did whatever the Debtor asked him to do and that the Debtor subcontracted out all of the work. Taking his testimony as true, Bagwell remembered only one project with any detail and could not name even one subcontractor, and thus, his testimony adds little except to confirm that the Debtor indeed controlled every detail of the business.

CASE NO. 3:17cv818-MCR/EMT

legitimate income from H&H's construction business also clearly reflect that the lion's share of income shown in H&H's accounts originated not from construction services as described by Bagwell but from the investors who paid for real estate transactions that never occurred.[14]

The Trustee also presented evidence that the Debtor conducted H&H's business and dealt with the corporation's assets as if it were his personal property, transferring or withdrawing money from the H&H accounts at his discretion and for his personal use and benefit, which, according to the Trustee, supported a "lavish lifestyle." The bank records and summaries confirm this.[15] Grizzle takes issue with what he contends is a "speculative" assertion that the Debtor lived a "lavish lifestyle" and argues that there is a reasonable inference that some of the expenditures deemed personal by the Trustee in fact could have been legitimate business expenses, such as purchases for supplies or for entertaining clients. Grizzle cites no evidence to support this other than the fact that the Debtor had personal bank accounts and the

---

[14] This is not to say that no victim had contact with H&H as a construction business. John L. Hybart, M.D., testified that he helped the Debtor start the company by loaning him money to obtain a general contractor's license. ECF No. 22-21, at 19-20. Also, he was aware of a job at Eglin Air Force Base where the Debtor was the general contractor through H&H and was aware of some home construction projects of H&H.

[15] The Court agrees with the Trustee that its summaries of evidence are admissible. *See* Fed. R. Civ. P. 1006; *see also In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1267 (11th Cir. 2015) (discussing the admissibility of summaries).

Debtor's ex-wife's affidavit statement that their personal credit union account was used for household expenses during her marriage to the Debtor.

Regardless of whether the Debtor's lifestyle could be considered "lavish," which is mere argument, the Trustee has shown by sufficient evidence that the legitimate income of H&H was not sufficient to support the Debtor's personal expenditures, and the account summaries reflect unexplained cash withdrawals and transfers from H&H's account to Debtor's and his ex-wife's personal accounts. The Debtor's ex-wife was not an H&H employee, and the Debtor had no formal salary from the corporation. Even assuming, in the light most favorable to the non-movant, that some of the "personal-sounding" transactions noted in bank records (such as payments to restaurants, Home Depot, or Lowe's) could be construed as legitimate business expenses, as Grizzle suggests, those expenditures still do not account for the fact that the Debtor's personal spending was well above his legitimate, non-Ponzi, income. Nor does it rebut the fact that the vast majority of the non-Ponzi transactions reflected in H&H account records consist of unexplained ATM cash withdrawals, transfers to the Debtor's personal accounts or to his ex-wife, and personal expenses such as home loan payments and other charges reflecting personal use (such as grocery stores, Troy University, Walgreens, etc.). The bank records reflect that transfers to these personal accounts occurred when the personal account

balances were low and also close in time to a deposit of money from a victim investor. As a whole, the evidence demonstrates that the Debtor treated H&H's accounts as his own with no regard for the corporation's separate existence. Thus, the Court finds no *material* question of fact on alter ego.

Second, the Debtor used H&H for the fraudulent and improper purpose of his Ponzi scheme. The evidence of this is not in dispute. The record, including Grizzle's testimony, shows that the Debtor enticed several individuals to transfer money to the H&H bank accounts based on the Debtor's misrepresentations that the funds would be held in escrow and/or used exclusively for real estate investment in return for profit. The undisputed evidence establishes that H&H played an integral role in the Debtor's fraudulent scheme—acting as the "agent" for the Debtor and the particular investor in the particular "buy-and-sell" transaction, and also purportedly serving as the escrow agent. Without exception, the Debtor fabricated these transactions and did not use the investor funds as promised. In sum, the Debtor deliberately used H&H's accounts and its name on fraudulent real estate contracts and escrow agent for the purpose of completing the fraudulent transactions. No doubt, the corporate name leant an air of legitimacy to the scheme as he pitched it to investors. While alter ego and improper purpose ordinarily present questions for the jury, the record

of the Ponzi scheme and the Debtor's indiscriminate use of H&H to accomplish it is undisputed in this case.

Finally, the Court agrees with the Trustee that the Debtor caused injury, the third element necessary to pierce the corporate veil under Florida law. *See Gasparini*, 972 So. 2d at 1055. The transfer of funds to Grizzle using money from the fraud perpetrated on investors left the Trustee with less property in the bankruptcy estate from which to ameliorate the losses to all other creditors. The Trustee's statutory power to avoid a preferential transfer depends in part on its ability to show that the transfer enabled one creditor to receive more than it otherwise would have under bankruptcy, *see* 11 U.S.C. § 547(b)(5) (an element already established in this case), which necessarily results in injury to all other creditors who will receive less from the estate. *See generally In re Ortega T.*, 562 B.R. 538, 542 (Bankr. S.D. Fla. 2016) (noting that "the focus of veil piercing . . . is the injury to creditors" based on "the abuse of the corporate structure" and that a trustee has authority to bring an alter ego claim). Here, the Debtor's pre-petition transfer to Grizzle took money invested by other victims and decreased the property that would otherwise have been available to the bankruptcy estate by paying it to Grizzle. Thus, the preferential transfer resulted in harm to all other creditors.

CASE NO. 3:17cv818-MCR/EMT

Grizzle further argues two affirmative defenses, that is, that the Trustee lacks standing to bring an alter ego claim (Fifth Affirmative Defense) and that questions of fact exist as to the application of the doctrine of *in pari delicto* (Fourth Affirmative Defense).[16] The Bankruptcy Court summarily but expressly rejected both of these defenses at the summary judgment hearing, ECF No. 22-1, at 3-4, and to the extent there is any basis for revisiting them under the Second Amended Complaint, this Court reaches the same conclusion. Grizzle's arguments regarding standing and *in pari delicto* are based on the same flawed premise that because the Trustee stands in the Debtor's shoes, he cannot not sue H&H to pierce its corporate veil because of the Debtor's own bad acts. First, the Trustee does not stand in the shoes of the debtor for purposes of avoiding a preferential transfer under § 547(b); instead, as noted above, the Trustee represents the interests of all creditors. Furthermore, the Trustee is expressly authorized by the statute to maximize the potential return to creditors by bringing an action to avoid a preferential transfer.

---

[16] Grizzle also argues that H&H must be joined as an indispensable party, which was his Sixth Affirmative Defense, but the Court rejects this out of hand. As noted *supra,* the Trustee has established alter ego status against H&H in a separate proceeding against H&H. Additionally, Grizzle did not move to dismiss the Second Amended Complaint for failure to state a claim (First and Seventh Affirmative Defenses) and his Second and Third Affirmative Defenses apply expressly to claims under § 548 (Counts II and III), which are not the subject of this summary judgment motion.

Similarly without merit is Grizzle's argument that the *in pari delicto* defense applies to a preference action, because, again, the Trustee does not bring a preference action as the Debtor's successor in interest. Although "the equitable defense of *in pari delicto* is available against any claim presented by the estate as a result of the estate obtaining rights of the debtor under section 541[,] . . . the *in pari delicto* defense may not be raised in response to an action brought by the estate representative under the provisions of the Bankruptcy Code itself, including fraudulent transfer and preference actions." *In re D.I.T., Inc*., 575 B.R. 534, 536 (Bankr. S.D. Fla. 2017); *see also In re Int'l Mgmt. Assocs., LLC,* No. 06-62966-PWB, 2016 WL 552491, at *14 (Bankr. N.D. Ga. Feb. 10, 2016) ("[T]he *in pari delicto* defense cannot be used to bar a trustee's fraudulent transfer and preference actions under 11 U.S.C. §§ 544, 547, and 548."); *In re Fin. Res. Mortg., Inc*., 454 B.R. 6, 24 (D.N.H. 2011) (holding the defense of *in pari delicto* not applicable in avoidance actions); *Kipperman v. Onex Corp*., 411 B.R. 805, 882 (N.D. Ga. 2009) ("[s]ince the trustee's claims are for the benefit of the creditors, the fraud of the bankrupt does not require them to be forfeited" (quoting *In re Davis*, 785 F.2d 926 (11th Cir.1986)).

The Court concludes that on the undisputed record in this case the alter ego theory has been proved by the Trustee, which justifies piercing the corporate veil.

CASE NO.  3:17cv818-MCR/EMT

Therefore, the Debtor and H&H are considered one in the same, and H&H's account is properly considered the Debtor's property. The Trustee is thereby allowed to avoid the $1,000,000 payment to Grizzle from H&H as a preferential transfer of an "interest of the debtor in property" under § 547(b). And having established liability on Count I, the Trustee is also entitled to judgment on Count IV in the event Grizzle has transferred the property to another.

Accordingly, the Plaintiff's Motion for Summary Judgment on Counts I and IV, ECF No. 22, is **GRANTED**. The Trustee is directed to advise the Court within fourteen (14) days as to whether it intends to proceed on Counts II and III or whether those Counts are moot or abandoned.[17]

**DONE AND ORDERED** this 31st day of March 2019.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[17] The Court notes that before the Bankruptcy Court there was a request for a Rule 54(b) executable money judgment and abatement of the remaining claims subject to appellate court review, after which, if affirmed on the preference claims, the Trustee would abandon the remaining Counts. ECF No. 22-1, at 25-26. If this is intended, the Trustee should submit a proposed final judgment within fourteen (14) days to flnd_rodgers@flnd.uscourts.gov.

CASE NO.  3:17cv818-MCR/EMT